UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
FELIX GOMEZ,

        Plaintiff(s),

KEHILAS BAIS YISROEL;
JOSEPH WARTELSKY; U.S. BANK TRUST,
N.A.; U.S. BANK TRUST, N.A., AS
TRUSTEE FOR LSF9 MASTER
PARTICIPATION TRUST; BANK OF
AMERICA, N.A.;
CALIBER HOME LOANS, INC.;
JOHN DOES 1-10,

        Defendant(s).
-------------------------------------------------------X

Case Number _____

## VERIFIED COMPLAINT

Plaintiff FELIX GOMEZ ("MR. GOMEZ"), by his counsel J.A. Sanchez-Dorta, for his Verified

Complaint against all Defendant (s), alleges as follows, with all allegations made upon information

and belief:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 18 U.S.C. §§ 1961, 1962, 1964 and 28

    U.S.C. § 1331.

2. Venue is proper in this Court based upon 28 U.S.C. §§ 1391 (b) and (c).

## PARTIES

3. Plaintiff FELIX GOMEZ ("Mr. Gomez"), is and has been a resident of the State of New

    York, having an address at 9-09 Cornaga Avenue, Far Rockaway, New York 11691

    (hereinafter, the "Home") on all pertinent dates hereinafter mentioned.

4.  Defendant KEHILAS BAIS YISROEL is a New York Religious Corporation located at 701 Bolton Road, Far Rockaway, New York 11691.

5.  Defendant JOSEPH WARTELSKY is an individual who resides at 1157 Virginia Street, Far Rockaway, New York 11691.

6.  Defendant(s) U.S. BANK TRUST, N.A. and/or U.S. BANK TRUST, N.A., AS TRUSTEE FOR LSF9 MASTER PARTICIPATION TRUST ("U.S. BANK TRUST") is one of the largest banking associations in the United States, and has an address at 180 5th St E Ste 200 Saint Paul, Minnesota 55101 and/or 100 Wall Street, Floor 16, New York, New York 10005-3716. It is incorporated in the state of Delaware and does significant business in New York.

7.  Defendant BANK OF AMERICA, N.A. ("BANK OF AMERICA") is one of the largest banking associations in the United States, and has an address at 100 N. Tryon Street, Charlotte, NC 282012 and/or Bank of America Corporate Center, Charlotte, North Carolina. It is incorporated in the state of Delaware and does significant business in New York.

8.  Defendant CALIBER HOME LOANS, INC. ("CALIBER") is a Delaware corporation which does business in New York as a Foreign Business Corporation.

9.  Defendants John Does 1-10 are named because upon information and belief there may be additional persons and entities which are currently unknown to Plaintiff who may have assisted Defendants in the acts set forth in this Verified Complaint.

**FACTUAL BACKGROUND**
**ALLEGATIONS RELATING TO ALL COUNTS**

9.  Mr. Gomez has owned his Home located at and known as 9-09 Cornaga Avenue, Far Rockaway, New York 11691 (the "Home") since December 12th, 1997. He and his family have occupied the Home from that time till today's date, over 23 years, as their primary residence.

10. On January 9th, 2004, Mr. Gomez entered into a mortgage agreement with Fleet National Bank in the amount of $142,407.42 (see Exhibit 1, "First Mortgage"). On that same date, Mr. Gomez also entered into an open end mortgage with Fleet National Bank in the amount of $121,000.00 (see Exhibit 2, "Second Mortgage").

11. On June 24, 2015, BANK OF AMERICA, N.A. SUCCESSOR  BY MERGER TO FLEET NATIONAL BANK, C/O CALIBER HOME LOANS, INC. (CALIBER signs as Bank of America's Attorney in Fact) assigned the First Mortgage to LSF9 MASTER PARTICIPATION TRUST C/O CALIBER HOMES, INC. (see Exhibit 3, "Assignment No. 1").

12. On March 9, 2016, LSF9 MASTER PARTICIPATION TRUST assigned the First Mortgage to U.S. BANK TRUST, N.A., AS TRUSTEE FOR LSF9 MASTER PARTICIPATION TRUST (see Exhibit 4, "Assignment No. 2").

13. U.S. Bank Trust commenced a foreclosure action under the First Mortgage against Mr. Gomez and the Home on or about November 8, 2016 with a Summons and Complaint prepared by the law firm Rosicki, Rosicki & Associates (see Exhibit 5, the "U.S. Bank Trust Summons and Complaint"). The U.S. Bank Trust Summons and Complaint, executed but not verified by attorney Joshua Sherer of ROSICKI, ROSICKI & ASSOCIATES, P.C., states in its paragraph 3 that "the note appears to be lost, stolen or

3

inadvertently destroyed…The Lost Note Affidavit and a copy of the original note are attached hereto as an Exhibit" (see page 3 of 81 through page 5 of 81 of the U.S. Bank Trust Summons and Complaint). The Affidavit of Lost Note is attached to the U.S. Bank Trust Summons and Complaint at page 24 of 81 through page 31 of 81.

14. On or about December 23, 2016, Bank of America, N.A. F/K/A Fleet National Bank, as a Defendant in the U.S. Bank Trust Summons and Complaint, via its attorneys David A. Gallo & Associates, filed with the Queens County Clerk documents serving as: 1) Notice of Appearance; 2) Claim to and Demand for Surplus Monies Pursuant to RPAPL 1351 and 1354; and 3) Notice of Demand for Deficiency Judgment (see Exhibit 6, "Notice of Demand for Deficiency Judgment").

15. On or about December 29, 2016, Bank of America commenced a foreclosure action under the Second Mortgage against Mr. Gomez and the Home with a Summons with Notice and Complaint prepared by its attorneys DAVIDSON FINK LLP (see Exhibit 7, the "Bank of America Summons and Complaint"). The Bank of America Summons and Complaint, executed and verified by attorney Elizabeth A. Clarke of DAVIDSON FINK LLP, states in its ELEVENTH paragraph "That the plaintiff is now the sole, true and lawful holder of the said bond/note/loan agreement…" (see page 6 of 28 of the Bank of America Summons and Complaint). However, the copy of the Note attached to that Bank of America Summons and Complaint pertains not to the Second Mortgage, but to the First Mortgage (see page 15 of 28 through page 19 of 28 of the Bank of America Summons and Complaint).

16. Actually, the Note attached to the Bank of America Summons and Complaint is the very same Note attached to and made a part of the Affidavit of Lost Note attached to the U.S.

4

Bank Trust Summons and Complaint, that is, the Note for the First Mortgage (the "First Mortgage Note").

17. The Note for the Second Mortgage (the "Second Mortgage Note") is nowhere to be found in the Bank of America Summons and Complaint, which attempts to foreclose on the Home via the Second Mortgage. This is significant, because at that time the only way one might foreclose on a home in New York State would be if one had standing and capacity to sue via the possession of the original note (or a Lost Note Affidavit in a form acceptable to the court) pertaining to the relevant mortgage.

18. Although the wrong Note, the First Mortgage Note, was attached to the Bank of America Summons and Complaint, a Certificate of Merit (which is required to be submitted by an attorney in order to commence a foreclosure) was also attached to the Bank of America Summons and Complaint, signed by DAVIDSON FINK LLP attorney Elizabeth A. Clarke. The Bank of America Certificate of Merit states "I certify that I have reviewed the facts of this case and that, based on consultation with representatives of the plaintiff, BANK OF AMERICA, N.A and my review of pertinent documents, including the mortgage, security agreement and note or bond underlying the mortgage executed by defendant… to the best of my knowledge, information and belief there is a reasonable basis for the commencement of such action and that the plaintiff is currently the creditor entitled to enforce rights under such documents." (See Exhibit 8, "Bank of America Certificate of Merit").

19. On or about May 19, 2017, Bank of America via its attorneys DAVIDSON FINK LLP, moved for an Exparte Order of Reference (the "Bank of America Motion for Exparte Order of Reference"). The Bank of America Motion for Exparte Order of Reference

5

was also based upon the First Mortgage Note rather than the requisite Second Mortgage Note.  A copy of the wrong Note, the First Mortgage Note (together with a copy of the Second Mortgage, the right mortgage) was attached to the Bank of America Motion for Exparte Order of Reference as Exhibit 1 (See Exhibit 9, "Exhibit 1 to the Bank of America Motion for Exparte Order of Reference").

20. Also attached to the Bank of America Motion for Exparte Order of Reference was an Amended Certificate of Merit (which is required to obtain an Order of Reference) signed by DAVIDSON FINK LLP attorney Cheryl L. Nielson. The Bank of America Amended Certificate of Merit states "I certify that I have reviewed the facts of this case and that, based on consultation with Lorene Alford Marsh, a representatives [sic] of the plaintiff, BANK OF AMERICA, N.A and my review of pertinent documents, including the mortgage, security agreement and note or bond underlying the mortgage executed by defendant… to the best of my knowledge, information and belief there is a reasonable basis for the commencement of such action and that the plaintiff is currently the creditor entitled to enforce rights under such documents." (See Exhibit 10, "Bank of America Amended Certificate of Merit").

21. Also attached to the Bank of America Motion for Exparte Order of Reference was an Affidavit in Support of Application for Order of Reference (which is required to obtain an Order of Reference) signed by Lorene Alford Marsh, an Assistant Vice President of Bank of America, in which this person states, "Lorene Alford Marsh, being duly sworn, deposes and says under penalty of perjury … 4. The business records show that this foreclosure action concerns the property located at 909 Cornaga Ave, Cornaga a/k/a Far Rockaway, NY 11691 (the Property).  The business records also show that the Loan is

evidenced by a promissory note (Note) executed by FELIX A. GOMEZ (Borrower and secured by a mortgage made to FELIX A. GOMEZ).  True and correct copies of the note, mortgage, are attached as Exhibit 1, and are business records of BANA.  BANK OF AMERICA, N.A. directly or through an agent, has possession of the promissory note.  The promissory note has been duly endorsed.  BANK OF AMERICA, N.A. is the successor by merger to Fleet National Bank of the security instrument for the referenced loan.  At the time this action commenced, Fleet National Bank was the holder of the note." (See Exhibit 11, "Bank of America Affidavit in Support of Application for Order of Reference").

22. On or about June 7, 2017, the Hon. Timothy J. Dufficy of the Queens County Supreme Court, relying on the certifications and sworn statements of Bank of America attorneys and vice-president Lorene Marsh, signed the Bank of America Order/Judgment of Reference.  An Order of Reference is required in a foreclosure action in order to appoint a referee, determines that there are no issues of fact that would require a trial in the foreclosure (similar to a motion for summary judgment in other matters), and is based upon representations that the foreclosing plaintiff has in its possession an original copy of the note (or a lost note affidavit acceptable to the court).

23. As one's possession of a mere copy of dollar bill (a note) is useless in the event one wants to purchase something, one's possession of a mere copy of a mortgage note in a foreclosure was also useless at that time to secure an Order of Reference in New York. One's possession of a mere copy of a mortgage note pertaining to a mortgage other than the mortgage being foreclosed upon is, thus, particularly useless (at all times) to secure an Order of Reference in New York. An Order of Reference is required before a

7

foreclosing plaintiff may file for a Judgment of Foreclosure and Sale.

24. The last page of the Bank of America Order/Judgment of Reference included a copy of a Certificate signed by Bank of America attorney Cheryl L Nielsen, Esq. of DAVIDSON FINK LLP stating that: "To the best of my knowledge, information and belief, formed after a reasonable inquiry under the circumstances, the presentation of this Order of Reference and or the contentions therein are not frivolous as defined in subsection (c) of section 130-1.1 of the Rules of the Chief Administrator (22 NYCRR)." This Certificate is required in order to obtain an Order of Reference in a foreclosure, and the judge relies on the same in its decision to grant an Order of Reference. (See Exhibit 12, "Bank of America Order/Judgment of Reference").

25. On or about September 25, 2017, Bank of America via its attorneys DAVIDSON FINK LLP, moved for a Judgment of Foreclosure and Sale.

26. Attached to the Bank of America Motion for Judgment of Foreclosure and Sale was an Affirmation of Regularity of Judgment of Foreclosure and Sale (which is required to obtain a Judgment of Foreclosure and Sale) signed by DAVIDSON FINK LLP attorney Cheryl L. Nielson.

27. The Bank of America Affirmation of Regularity of Judgment of Foreclosure and Sale states: "Cheryl L. Nielsen, an attorney and counselor at law of the State of New York, hereby affirms pursuant to CPLR §2106[1] that: 1. I am duly admitted to practice law in the State of New York, that I am with the firm of Davidson Fink LLP, counsel for

---

[1] CPLR 2106 provides that "The statement of an attorney admitted to practice in the courts of the state, or of a physician, osteopath or dentist, authorized by law to practice in the state, who is not a party to an action, when subscribed and affirmed by him to be true under the penalties of perjury, may be served or filed in the action in lieu of and with the same force and effect as an affidavit."

Plaintiff herein, and that I am fully familiar with the subject matter of this action and with all the proceedings heretofore had herein;…4. That the Summons, Verified Complaint and Notice of Pendency were duly filed in the Office of the Clerk of the County of Queens on January 4, 2017, and all documents were in the form prescribed by the Civil Practice Law and Rules of the State of New York and contained all the particulars required by law to be stated in said documents;… 11. That all of the proceedings heretofore had herein have been regular and in accordance with the rules and practice of this Court;…" (See Exhibit 13, "Bank of America Affirmation of Regularity of Judgment of Foreclosure and Sale").

28. Also attached to the Bank of America Motion for Judgment of Foreclosure and Sale as Exhibit A was a Referee's Oath, together with a Referee's Report of Amount Due (which is required to obtain a Judgment of Foreclosure and Sale) signed by the Referee Mitchell Kaufman. The Referee's Oath states: "2. Based upon the documentary evidence introduced before me, I have computed and ascertained the amount due to the plaintiff under said note/bond and mortgage… 3. The following documentary evidence introduced before me shows the amounts due for principal, interest and other amounts now due the plaintiff: a. A conformed copy of the Order of Reference; b. An Affidavit of Amount Due verified by Lorene Alford Marsh Assistant Vice President of BANK OF AMERICA, N. A., the plaintiff, sworn to on July 25, 2017, stating that the total amount owing to the plaintiff in unpaid principal, interest, late charges owing prior to acceleration and property preservation is $138,032.45. Said affidavit is attached hereto and made a part hereof as **Exhibit A**; c. A copy of the Note which is attached hereto as **Exhibit B**…".

29. Nevertheless, the copy of the Note attached as Exhibit B to the Referee's Oath is not the copy of the First Mortgage Note (which was, in error, utilized in the Bank of America Summons and Complaint to allege standing and capacity to sue, in order to justify the very commencement of the action, and was utilized in order to obtain the Bank of America Order/Judgment of Reference) but a copy of the Second Mortgage Note.

30. Thus, the correct note, that is, the Second Mortgage Note, had evidently been found at that point and presented to the Referee (by Bank of America and/or its attorneys) in order to assist him in his preparation of the Referee's Oath, which is necessary to obtain a Judgment of Foreclosure and Sale. (See Exhibit 14, "Bank of America Referee's Oath").

31. Based upon the representations of Bank of America and its attorneys, and the Referee's Oath (which was based upon the Bank of America Order/Judgment of Reference [which had been secured via the erroneously filed First Mortgage Note, and statements by Bank of America and its attorneys made under penalty of perjury] and the sudden appearance of the Second Mortgage Note [without any reference to the First Mortgage Note, nor to the fact that the First Mortgage Note had been used to commence the action via the Bank of America Summons and Complaint and to obtain the Bank of America Order/Judgment of Reference]), on or about October 30, 2017 the Hon. Timothy J. Dufficy ruled in favor of Bank of America (see Exhibit 15, the "Bank of America Memorandum Granting Motion for Judgment of Foreclosure and Sale"), and on or about October 26, 2018 awarded Bank of America a Judgment of Foreclosure and Sale (see Exhibit 16, "Bank of America Judgment of Foreclosure and Sale").

32. Thus, Bank of America and/or its attorneys intentionally deceived a Queens County

10

Supreme Court Judge and a Referee by failing to advise them of their error regarding the First Mortgage Note, and by simply adding the Second Mortgage Note to their Bank of America Motion for Judgment of Foreclosure and Sale. They did so with the expectation that no one would notice this deceit because a) Mr. Gomez did not have an attorney, and b) the Queens Supreme Court Judge and Referee normally (and justifiably) rely upon the sworn statements and certifications of a plaintiff in a foreclosure and its attorney and do not normally so very carefully review previously filed papers for inconsistencies as would counsel for a defendant in a foreclosure.

33. The reason for this deception was that admitting their error to the Queens Supreme Court Judge and Referee would have required Bank of America and its attorneys to move to dismiss the Bank of America Summons and Complaint and to commence an entirely new action.

34. Nevertheless, since many defendants, when they actually receive the requisite Notice of Sale which specifies the date for a foreclosure sale, hire an attorney to review the documents and attempt to stop the foreclosure by looking for a defense (defects, etc.) in the paperwork, to ultimately seek a foreclosure sale based upon the papers submitted in the Bank of America foreclosure was a risky tactic for Bank of America and/or its attorneys.

35. A less risky option for Bank of America and its attorneys was available via its Notice of Demand for Deficiency Judgment filed in the U.S. Bank Trust foreclosure, which would permit it to "piggyback" on a future U.S. Bank Trust foreclosure sale, and to be paid out of the proceeds of a future U.S. Bank Trust foreclosure sale without having to conduct its own Bank of America foreclosure sale based upon the faulty and fraudulent

11

paperwork filed in the Bank of America foreclosure.

36. An attorney hired by Mr. Gomez to stop the U.S. Bank Trust foreclosure sale would not be expected to delve too deeply into the documentation presented in the Bank of America foreclosure since there was never a Bank of America foreclosure sale to stop in the first place, and any letter of engagement would be limited to a thorough investigation of the U.S. Bank Trust foreclosure documentation in order to stop the U.S. Bank Trust foreclosure sale. Since there was no Bank of America Notice of Sale, an attorney hired to defend against the U.S. Bank Trust foreclosure sale might not even be aware of the existence of a Bank of America Summons and Complaint.

37. On or about November 28, 2017, the Supreme Court, Queens County granted a default judgment against Mr. Gomez in favor of U.S. Bank Trust and appointed a referee to compute. (See Exhibit 17, "U.S. Bank Trust Order of Reference").

38. Although Mr. Gomez had hired an attorney, who he believed was handling the various foreclosure matters before the Supreme Court, Queens County, that attorney had merely filed a bankruptcy petition by forging Mr. Gomez' signature on the bankruptcy petition. That attorney has been suspended from the practice of law for reasons unrelated to Mr. Gomez' matter.

39. The U.S. Bank Trust Order of Reference appointed as referee Donna Furey, Esq. Unlike Mr. Gomez' previous attorney, the referee Donna Furey, Esq. remains in good standing as an attorney in New York State.

40. On or about December 26, 2017, U.S. Bank Trust filed its Motion for a Judgment of Foreclosure and Sale, with a proposed Judgment of Foreclosure and Sale indicating

Donny Furey, Esq. as the referee. (See Exhibit 18, "U.S. Bank Trust Proposed Judgment of Foreclosure and Sale").

41. The Motion for Judgment of Foreclosure and Sale included, as its Exhibit A, a Referee's Oath prepared by Referee Donna Furey (See Exhibit 19, "U.S. Bank Trust Referee's Oath").

42. On or about February 27, 2018, the Hon. Denis J. Butler of the Queens County Supreme Court signed an order granting the unopposed U.S. Bank Trust Motion for Judgment of Foreclosure and Sale, which also indicated Donna Furey, Esq., as the Referee (See Exhibit 20, "U.S. Bank Trust Memorandum Granting Motion for Judgment of Foreclosure and Sale").

43. On or about March 2, 2018, U.S. Bank Trust again filed what appears to be the same Proposed Order of Judgment of Foreclosure and Sale filed as part of its original Motion for Foreclosure and Sale, which again indicated Donna Furey as Referee (See Exhibit 21, "March 2, 2018 U.S. Bank Trust Proposed Judgment of Foreclosure and Sale").

44. On or about June 18, 2018, U.S. Bank Trust filed a Consent to Change Attorney, indicating that the law firm Fein, Such & Crane LLP be substituted as attorney of record in place of ROSICKI, ROSICKI & ASSOCIATES (See Exhibit 22, "U.S. Bank Trust Consent to Change Attorney").

45. Three months later, on or about September 20, 2018, the Hon. Denis J. Butler signed the U.S. Bank Trust Judgment of Foreclosure and Sale, which was entered on October 11, 2018 (See Exhibit 23, "U.S. Bank Trust Judgment of Foreclosure and Sale").

46. The U.S. Bank Trust Judgment of Foreclosure and Sale was based upon Referee Donna Furey's report, but substituted via handwritten note Donna Furey, Esq. as Referee with

13

David L. Cohen, Esq. as Referee (See page 3 of 13 of Exhibit 23, the "U.S. Bank Trust Judgment of Foreclosure and Sale").

47. Upon information and belief, officially it is the court who appoints a referee, but unofficially, foreclosure plaintiff's attorneys often have input into the choice of referee. Foreclosure plaintiff's attorneys will deny this occurs, but upon information and belief, it actually does occur in some courts.

48. On October 10, 2019, Mr. Gomez had his new attorney Mr. Steinberg file a motion to stop the U.S. Bank Trust foreclosure sale scheduled for October 11, 2019, which motion contained an Affirmation (See Exhibit 24, "First Steinberg Affirmation").

49. The First Steinberg Affirmation states, in relevant part:

> "4. FELIX details that the balance due as per the December 3, 2019 was $132,636.46 and that a rough calculation would bring the balance due to less than $140,000.00. This is the amount to payoff the mortgage in full, not reinstate the mortgage. FELIX also unequivocally states that he has the money available to payoff the full balance of the mortgage and that he will do so, but the problem is a sale is scheduled for October 11, 2019. FELIX attempted to address this issue with the bank, but was unsuccessful. I was retained to resolve this matter with the bank and wrote at least three letters to Counsel for the bank without response. A copy of my correspondence dated October 4, 2019, September 25, 2019 and September 23,2019 are annexed hereto as Exhibit "G". Additionally, I called the bank's Counsel several times without any response until finally today, October 10, 2019, I spoke with a very helpful gentlemen, Joseph Costello at the office of Fein, Such & Crane, bank's Counsel who advised me that the sale was scheduled for October 11, 2019, that reinstatement was not possible as the loan had matured and that a full payoff of the loan could not be accomplished prior to the sale scheduled for the following morning, October 11, 2019. Mr. Costello sent me a copy of the Notice of Sale. Thereupon, I confirmed with my client that he had the funds, and more to fully satisfy the mortgage obligation and commenced drafting this Order to Show Cause."

50. The letters to the bank's counsel referenced in the First Steinberg Affirmation are attached hereto as an Exhibit (See Exhibit 25, "Steinberg Letters").

51. The First Steinberg Affirmation also indicated as follows:

> "6. In reviewing the docket in this matter, I note that on January 25, 2019, the Plaintiff filed a Motion to Extend Time to Conduct the Foreclosure Sale and Ratify the Foreclosure Sale. A copy of the Docket is annexed hereto as Exhibit "H". In reviewing the Docket, I note that the Motion has not been decided. Therefore, it is incomprehensible how the Plaintiff can proceed to a sale, after filing a Motion to Extend the Time to Conduct the Sale, when the Motion has not been decided. For this reason alone, the impending sale must be cancelled. It was reasonable for FELIX not to understand that a sale was pending when a Motion seeking permission of the Court to Extend the Time to Conduct the Sale was also pending.
> 7. Until I received a clear copy of the Notice of Sale earlier today, I did not know that the sale was scheduled for tomorrow, October 11, 2019. When Counsel for the bank advised me of same, I again reviewed the Docket and could not understand how with a pending Motion to Extend the Time to Conduct the Sale, without a Court Order, how a sale could proceed. My client's confusion was understandable…
> 9. I cannot understand or explain how a sale has been noticed without the Court deciding the Motion seeking more time to conduct the sale. Even if there is some logical explanation, the confusion by proceeding in this manner against a homeowner with significant equity, balances in favor of allowing the homeowner to payoff the mortgage and save his home."

52. The copy of the portion of the Docket relevant to the issue raised in the First Steinberg's Affirmation is attached hereto, and it does, in fact, indicate that a Motion to Extend Time and Ratify Sale was filed on January 25, 2019, and as of the date when Mr. Steinberg filed his Notice of Appearance, October 10, 2019, to be followed by his motion of the same date containing the First Steinberg Affirmation, there had been no decision rendered by the Queens Supreme Court on that Motion (See Exhibit 26, "Copy of U.S. Bank Trust Docket").

53. The Affirmation in support of the Motion to Extend Time and Ratify Sale indicates that "pursuant to the Judgment of Foreclosure and Sale, Plaintiff was directed to conduct the foreclosure sale by January 9th, 2019…6. The earliest available date for the foreclosure sale to be conducted was February 1, 2019. Accordingly, a foreclosure sale has been

scheduled for February 1, 2019 at 10:00AM...9. All proceedings herein have been regular and in conformity with the rules and practice of this Court." (See Exhibit 27, "Affirmation in Support of the Motion to Extend Time and Ratify Sale").

54. On March 3, 2019, a Foreclosure Auction Surplus Monies Form was filed, indicating that a sale of the Home was set for February 1, 2019, to an individual known as Ari Drach, with an address at 939 E 29th Street in Brooklyn, but although it is signed by the referee, David Cohen, and the plaintiff's representative, on February 1, 2019, it is not signed by Ari Drach as purchaser (See Exhibit 28, "U.S. Bank Trust Foreclosure Auction Surplus Monies Form for Ari Drach").

55. Although the Hon. Dennis J. Butler signed the Steinberg First Order to Show Cause supported by the First Steinberg Affirmation, he struck the stay and the foreclosure sale of the Home was held (See Exhibit 29, "Signed Steinberg First Order to Show Cause").

56. The Home was sold to Joseph Wartelsky for $810,000.00 on October 11, 2019, and thereafter assigned to Kehilas Bais Ysroel, a Far Rockaway congregation (see Exhibit 30, "U.S. Bank Trust Referee's Report of Sale").

57. On or about November 1, 2019, Mr. Steinberg filed another Order to Show Cause. The Affirmation attached to that Order to Show Cause provides greater detail as to what occurred on October 11, 2020 in the court (leaving out the verbal abuse which Mr. Steinberg informed me [confirmed to me by Mr. Gomez] that he was subjected to by the Hon. Denis J. Butler, including threats to sanction Mr. Steinberg for even bringing the motion) (See Exhibit 31, "Second Steinberg Affirmation"):

12.    "There was a prior Order to Show Cause submitted by your Affirmant on behalf of FELIX on October 11, 2019, at 9:00 a.m.   The Order to Show Cause sought a stay of the sale.  This Order to Show Cause was submitted on notice to FEIN SUCH & CRANE, LLP, Counsel to the Plaintiff and Referee DAVID L. COHEN.

16

13.     This Order to Show Cause was not submitted any earlier as prior to that date, on behalf of FELIX, your Affirmant had attempted to secure the reinstatement of the mortgage. I wrote to FEIN SUCH & CRANE, LLP multiple times, sent an authorization letter permitting FEIN SUCH & CRANE to speak with me on behalf of FELIX and called their office numerous times. Copies of my correspondence to FEIN SUCH & CRANE, LLP; dated September 23, 2019, September 25, 2019, and October 4, 2019, along with the applicable facsimile transmission receipts, are annexed hereto as **Exhibit "K".**

14.     It wasn't until approximately 3:30 p.m. on October 10, 2019 that your Affirmant was able to receive information from FEIN SUCH & CRANE about the foreclosure sale. First, I was advised that the sale was scheduled for the following day, October 11, 2019. Second, I was told that to avoid the foreclosure sale, the entire mortgage must be paid off. I spoke with Joseph Costello of FEIN SUCH & CRANE who told me that payoff of the mortgage would be accepted to cancel the sale. He also told me that he would attempt to secure an updated payoff figure.

15.     Faced with the emergency situation of a sale scheduled for the next morning, the scope of representation was immediately expanded to include representation in Court at which time I commenced drafting an Order to Show Cause to stay the sale. This was the October 11, 2019 Order to Show Cause.

16.     FELIX advised that he could and would immediately payoff the mortgage to save his family's home. As I did not have a payoff figure, and to avoid potential problems, I drafted the aforementioned October 11, 2019 Order to Show Cause. I advised FELIX to come to my office the evening of October 10, 2019 to review and sign his Affidavit. He did so. I also advised him that earlier that evening I had received a payoff letter dated October 11, 2019 which set forth that the payoff of the mortgage, good through October 10, 2019 was in the amount of $156,685.96. A copy of this payoff letter is annexed hereto as **Exhibit "L".**

17.     I advised FELIX that as soon as the bank opened on the morning of October 11, 2019, that he should secure certified funds in the amount of $157,000.00 and come to the Court as quickly as possible.

18.     I told FELIX that the mortgage had to be paid off in full and there was an agreement to accept payment in full of the mortgage and the foreclosure sale would be canceled.

19.     As set forth by FELIX in paragraph 8 of his Affidavit, he was at the bank as soon as it opened and proceeded to procure two (2) bank checks totaling $157,000.00. The checks were payable to Caliber Home Loans. A copy of these bank checks is annexed hereto as **Exhibit "E"**.

20.     Meanwhile, while FELIX was securing the required bank checks, I arrived at the Courthouse at 8:45 a.m. and got on line outside of Room 140 to submit the proposed Order to Show Cause. The Order to Show Cause was reviewed by the Clerk's Office and I was told to bring the Order to Show Cause to the Courtroom of Justice Butler, Part 12, Room 42. Counsel for the Plaintiff, Christine Montaro and I then proceeded to the Courtroom of Justice Butler and presented the proposed Order to Show Cause.

21.     I advised Ms. Montaro that my client was coming to the Courthouse with bank check totaling $157,000.00 to fully satisfy the mortgage. She advised that he (sic) instructions did not include accepting payoff of the full mortgage amount, but rather were limited to opposing the Order to Show Cause. Ms. Montaro contacted her office for further direction.

22.     I also advised Justice Butler that my client was in the bank securing bank checks in full satisfaction of the mortgage. I was asked by Justice Butler at approximately 10:00 a.m. if my client was in the Courthouse with the checks and told him that my client was on the way to the Courthouse from the bank's branch in Melville where he conducted business. Justice

17

Butler agreed to delay consideration of the Order to Show Cause to allow additional time for my client to reach the Courthouse with the required funds.

23.     At 10:08 a.m. I received a text with a picture of the first bank check in the amount of $57,000.00 and at 10:11 a.m., I received a text with a picture of the second bank check in the amount of $100,000.00. I showed these pictures of the checks to attorney Montaro and advised the Court of the receipt of same, offered to show Justice Butler the pictures of the two bank checks and reiterated that my client was rushing to the Courthouse from the bank. Justice Butler declined the offer to see the bank checks, asking when my client would be in the Courthouse with the checks. I advised him that it would be less than a half hour. This occurred at approximately 10:15 a.m.

24.     At 10:16 a.m. and 10:17 a.m., I sent two e-mails to Joseph Costello of FEIN SUCH & CRANE demonstrating that payment in full would be tendered within a few minutes. Mr. Costello was the person that I spoke with on October 10, 2019 who advised that payment in full of the balance due under the mortgage was required and would be accepted to cancel the foreclosure sale.

25.     At approximately 10:20 a.m., I was advised by Ms. Montaro that she had been in contact with her office and that her client was considering whether to accept the checks.

26.     A few minutes later, Justice Butler's Clerk circulated copies of the signed October 11, 2019 Order to Show Cause, with the stay of the sale struck. See Exhibit "C".

27.     At that time, there had been no decision from Counsel for the Plaintiff as to whether payment in full would be accepted.

28.     Ms. Montaro advised me that she needed to go put money in the meter and would return in a few minutes and meet me on the second floor.

29.     Thereupon, your Affirmant called Joseph Costello at FEIN SUCH & CRANE reiterated that payment in full would be in the Courthouse in a few minutes and was advised that Mr. Case of FEIN SUCH & CRANE, was on the phone with the client asking whether they would agree to accept payment in full. After waiting on hold for a few minutes, Joseph Costello returned to the phone and advised me that the client would not accept payment in full. My request to speak to Mr. Case or to the client was rejected. This occurred at approximately 10:40 a.m. on October 11, 2019. I waited for attorney Montaro to return as promised, but this never occurred.

30.     As set forth in paragraph 10 of FELIX's Affidavit, he arrived at the Courthouse with the two bank checks at 10:45 a.m. At that time, I advised him that the Plaintiff would not accept payment in full of the mortgage, notwithstanding the agreement to accept same and that Justice Butler had signed the Order to Show Cause, but struck the stay, thereby permitting the Plaintiff to proceed with the foreclosure action that morning. Thereafter, notwithstanding the fact that FELIX had all funds necessary to payoff the mortgage with him in the Courthouse and there was an agreement to accept same, his home then proceeded to be sold at the foreclosure auction.

31.     Notwithstanding the unequivocal agreement with Counsel for the Plaintiff to accept payment in full of the mortgage thereby canceling the sale, the Plaintiff bank refused to accept payment in full. As a result, FELIX's home was sold at the October 11, 2019 foreclosure sale. Now, in this Order to Show Cause we seek relief from the Court staying the transfer of the deed to the Premises and requiring the Plaintiff bank to accept payment in full.

32.     While neither FELIX nor your Affirmant have any idea as to why the Plaintiff reneged on the agreement to accept payment in full, it is uncontroverted that FELIX had the funds in Court that morning and has the funds to immediately pay the Plaintiff bank in full. As set forth by FELIX in his Affidavit, he has the original $157,000.00 in bank funds and an

18

additional $10,000.00 in bank funds to cover any additional expenses, such as the Referee's fee. See Exhibits "E" and "G".

39.    …Although the sale was noticed for 10:00 a.m. on October 11, 2019, foreclosure sales in the Supreme Court, County of Queens do not commence until 10:30 a.m. at the earliest, pursuant to the direction of Interim Administrative Judge, Hon. George J. Silver which set forth that effective Friday, September 6, 2019, "Foreclosure auctions will begin at 10:30 a.m." See **Exhibit "M",** "Overview", annexed hereto.

40.    Instead of allowing a short additional time for FELIX to arrive at the Courthouse with the required bank funds, at approximately 10:25 a.m., just before Ms. Montaro went to put money in the parking meter for her car, Justice Butler signed the Order to Show Cause, but struck the stay.

41.    Further, the sale was allowed to proceed notwithstanding that it was beyond the deadline in the Judgment of Foreclosure and Sale.  Annexed hereto as **Exhibit "N"** is a copy of the Judgment of Foreclosure and Sale dated September 20, 2018."

58. The court did not grant the relief requested in the Second Steinberg Order to Show Cause.  Mr. Gomez retained me to represent him in the U.S. Bank Trust foreclosure matter.

59. On or about November 11, 2019 I filed an Emergency Order to Show Cause with TRO (See Exhibit 32, "Sanchez Order to Show Cause"), requesting a stay while the court considered a separate Motion (the "Sanchez Motion") seeking, among other things, to vacate the default judgment, set aside the foreclosure sale and accept Mr. Gomez' payment which I also filed on November 11, 2019 (See Exhibit 33, "Sanchez Notice of Motion and Affirmation").

60. I appeared before the court on November 12, 2019, and present at oral argument was the same attorney from the bank, Ms. Montaro, and an attorney for the Kehilas Bais Ysroel. Although I expected the same treatment that Mr. Steinberg told me he had received, the Hon. Denis J. Butler was polite and was obviously familiar with the content of the filed Sanchez Motion.  Some minor threats were directed towards me by the Hon. Denis J. Butler in support of arguments set forth by the attorney for Kehilas Bais Ysroel, but after it became clear that I was prepared to withdraw without prejudice the Sanchez Order to

Show Cause (See Exhibit 34, "Withdrawn Order to Show Cause"), but was not willing to withdraw the Sanchez Motion, the matter was adjourned to November 19, 2019.

61. On one of the adjournment dates, on or about December 3, 2019, I sent another attorney in my place because I had oral argument scheduled before the Second Appellate Division on another matter, and that attorney informed me that he was threatened with sanctions if he didn't withdraw one of the Steinberg Orders to Show Cause. I told him to do so since I had ensured the submission of one of the Steinberg Orders to Show Cause and I had incorporated the Steinberg Order to Show Cause in question as an exhibit to the Sanchez Motion in any event.

62. I had to return to the court on a number of other occasions (upon information and belief, on November 19, 2019, December 3, 2019 [I sent another attorney], December 10, 2019 and December 17, 2019), and withdraw other papers I had intended to file, in my efforts to simply ensure the Sanchez Motion was marked for submission (thus, ultimately requiring a determination on the Sanchez Motion by the Hon. Denis J. Butler).

63. I was brought on several occasions to the chambers of the Hon. Denis J. Butler. During those various occasions the following, among other things, occurred: a) I was many times threatened with sanctions by the Hon. Denis J. Butler if I failed to withdraw the Sanchez Motion; b) upset that I wouldn't withdraw the Sanchez Motion, the Hon. Denis J. Butler stood up from behind his desk in what seemed like a physical challenge (he is a very large man and I am 5' 5"), which shocked me and appeared to even shock the lawyers for the bank and for Kehilas Bais Ysroel and/or Joseph Wartelsky; and c) the bank's counsel, evidently via a Freudian slip of some sorts, referred to counsel for the purchaser, Kehilas Bais Ysroel and/or Joseph Wartelsky as "co-counsel".

20

64. In my last appearance before the court, December 17, 2019, I agreed with the Hon. Denis J. Butler to withdraw my opposition to the Referee's motion for additional payment in order for the court to agree to allow that the Sanchez Motion be marked final for submission.

65. I was subsequently informed by an attorney who attempted to secure the transcripts of the oral argument before the Hon. Denis J. Butler that, as hard as he tried, he could not secure the transcripts. (See attached as Exhibit 35, "Affirmation Regarding Transcripts").

66. Fortunately, via emails I sent to myself during and right after some of the court appearances, I was able to preserve some of what had occurred, in my point of view, that particular day in the court of the Hon. Denis J. Butler.

67. For example, in an email I sent to myself on December 10, 2019 at 9:59 am I wrote:

**Jay Sanchez** <jayanthonysanchez@yahoo.com>
To:Me
Tue, Dec 10, 2019 at 9:59 AM
When we appeared to hand in our papers at the calendar call, number 32, banks attorney and purchasers attorney also came up to hand in their papers and the Court Clerk said, "Ok, we are going to conference this. The judge was at the door of his chambers looking out into the court, which I found strange because David said that the last time, when the judge threatened sanctions if we didn't withdraw the order to show cause, he was on the bench and carefully debating the merits of each motion, which I found strange because when I handed in the motion previous to that (on November 19th), the judge didn't even appear in the part and it was done on submission only.

Sent from my iPhone

68. In a second email I sent to myself on December 10, 2019 at 10:45 am I wrote:

**Jay Sanchez** <jayanthonysanchez@yahoo.com>
To:Me
Tue, Dec 10, 2019 at 10:45 AM
Bank did not come with its exhibits, so they adjourned to the 17th, when the referee's papers will also be submitted.

Sent from my iPhone

69. In a third email I sent to myself on December 10, 2019 at 10:55 am I wrote:

**Jay Sanchez** <jayanthonysanchez@yahoo.com>
To:Me
Tue, Dec 10, 2019 at 10:55 AM
What was interesting was that the lawyer for the bank was a new guy, an innocent, didn't bring all the papers, while it was the lawyer for the purchaser who mentioned that he didn't have all the papers, requiring that the adjourn.

Sent from my iPhone

70. What I found interesting was that the young lawyer sent by the attorneys for U.S. Bank Trust didn't bring all of his exhibits, but was so confused that he initially failed to mention that fact. This required that the attorney for the purchaser, Kehilas Bais Ysroel and/or Joseph Wartelsky, interject to mention that the attorney for the bank didn't bring his exhibits, requiring that the matter be adjourned.

71. I didn't understand how the attorney for the purchaser, Kehilas Bais Ysroel and/or Joseph Wartelsky, had become privy to the contents of the papers of the attorney for U.S. Bank Trust, seemed to know more about the contents of the papers of the attorney for U.S. Bank Trust than the very same attorney for U.S. Bank Trust, and found himself in the position of advocating for an adjournment for the attorney for U.S. Bank Trust, like a more senior counsel stepping in to support a more junior counsel who had forgotten his assigned line at oral argument.

72. In an email I sent to myself on December 17, 2019 at 12:21 pm I wrote:

**Jay Sanchez** <jayanthonysanchez@yahoo.com>
To:Jay Sanchez-Dorta
Tue, Dec 17, 2019 at 12:21 PM
Appeared before the court attorney, attempted to file at first call, told us second call, to conference, bank attorney had to go elsewhere so I took down his number, texted him when we were close and he came. Tried to file again at second call, but referee was not there, so the clerk sent us to discuss in the judge's chambers. We greeted the judge, and the judge began to speak, addressing  the bank's attorney, asking why referee has not been paid and why was this being opposed. He couldn't explain, and so as not to be accused of not being forthcoming with the court, since the issue had been raised by the judge, I mentioned that I have filed a cross motion. The Judge became very aggressive towards me, telling me he wasnt asking me, that the last time I was here I didn't answer his simple question, threatening me with sanctions, 10,000 a piece for every incident, retroactive, based upon my inability to answer his question

22

with a yes or no (the question was whether I wanted to have both motions, mine and the referee's considered together), and the fact that I did not have certain affidavits necessary to question the referee's fees). He also noted that I had not filed the Notice of Appearance in the case.

He directed himself to the banks attorney, asking why the referee has not been paid, noting how qualified the referee was, and told us to go outside to work it out.

When we went outside, the banks attorney noted that we can't work anything out without the referee being present, and asking whether we could adjourn it for his appearance, the purchasers attorney told us that he would not adjourn the matter, and so I reached out to the referee, spoke to his secretary, who told me he was in a trial and that another law firm was going to appear for them, she took my number and they said they would call me.

Sent from my iPhone

73. The failure of the referee to appear (to submit his own motion and respond to my opposition to his motion) brought to mind the decision of Ms. Montaro, attorney for U.S. Bank Trust on the date of the foreclosure sale, to return to her car to check the meter and to never return.

74. In a second email I sent to myself on December 17, 2019 at 12:46 pm I wrote:

**Jay Sanchez** <jayanthonysanchez@yahoo.com>
To:Jay Sanchez-Dorta
Tue, Dec 17, 2019 at 12:46 PM
Went before the judge, Felt obligated to sacrifice my opposition to referee's motion to ensure my motion fully submitted, judge said fully submitted 47 and fully submitted 48, sent us to judges chambers to talk with his clerk, as we headed in bank attorney asked if 48 was fully submitted, judge heard him but seemed to pretend he did not hear him, so went back, clerk revised a bit the referee's papers, heard our arguments, at one point the purchasers attorney referred to the bank attorney as co-counsel, then I handed in my motion and my notice of appearance, both marked as Working Copy, and clerk said fully submitted.

Sent from my iPhone

75. I was relieved that, despite all indications that it was going to be impossible to have the Sanchez Motion marked as fully submitted (which I needed to obtain a decision by the Hon. Denis J. Butler), I had finally done so.

23

76. However, given all the truly odd occurrences in court, I was still concerned that a technicality might be discovered that would permit the Hon. Denis J. Butler to retroactively determine that my Motion should not have been marked fully submitted.

77. In a third email I sent to myself on December 17, 2019 at 3:17 pm I wrote:

**Jay Sanchez** <jayanthonysanchez@yahoo.com>
To:Jay Sanchez-Dorta
Tue, Dec 17, 2019 at 3:17 PM
Given judges emphatic reference and concern for his rules, downloaded yesterday a copy of his rules and saved as a PDF with title Part 12 Rules. Nevertheless, when I went to check his rules today after returning from Court, it said "The requested page could not be found". To ensure it was not a system wide error, checked another judge's rules, Judge Cohanim Lancman and determined that they were available.

78. Fortunately, despite this strange occurrence (the last in a long list of strange occurrences), the Sanchez Motion was not retroactively withdrawn by the court, and via Decision and Order of the Hon. Denis J. Butler dated January 22, 2020, the Sanchez Motion was denied (see Exhibit 36, "Decision and Order of the Hon. Denis J. Butler dated January 22, 2020").

79. On behalf of Mr. Gomez, on February 26, 2020 I filed a Notice of Appeal from the Decision and Order of the Hon. Denis J. Butler dated January 22, 2020 (See Exhibit 37, "Notice of Appeal"), and perfected the Appeal on October 26, 2020 (See Exhibit 38, "Defendant-Appellant's Brief"). The facts presented above regarding what occurred at the court could not be included in the Defendant-Appellant's Brief, and given the fact that there were no transcripts available of oral argument, the facts presented in the Defendant-Appellant's Brief were limited to that set forth in the Sanchez Motion.

80. Those facts set forth in the Defendant-Appellant's Brief and derived from the Sanchez Motion are as follows:

"The instant matter deals with a particularly interesting question, which has arisen recently with regards to a number of my other foreclosure matters and, quite frankly, I believe, must be addressed by the Appellate Division: what is occurring in the lower

24

courts that is permitting so many foreclosures to be pushed through so quickly to sale to speculators without any regard for the law and/or equity?

Mr. Gomez, a middle-aged husband and father who speaks primarily Spanish (he can speak English, but not very well, and he does not strike me as very sophisticated when it comes to the law and foreclosure litigation), retained me just a day or two before the deadline for the transfer of his foreclosed home to the speculators who purchased the home. Quite frankly, his story surprised me.

He and his wife explained to me how his Home, in which he has lived for some twenty odd years, located close to the neighborhood shop which he has owned for about that same amount of time, located in a recently gentrifying area of Queens, worth in the area of $1.5 Million, was foreclosed upon in under three years based upon a mortgage of approximately $150,000 (that is, ten percent of the value of the Home). He and his wife explained to me how the first attorney he retained, who he had believed he had retained to defend his home, did not file an answer in the foreclosure action but, simply, filed two bankruptcies, without his permission and by forging his signature (I actually checked the file and it appears that no answer was filed. Attached as Exhibit C to the Motion (RA 123-124) please find a copy of an order which states that the Defendant-Appellant defaulted on the foreclosure settlement conferences, although it would be more accurate to state that their attorney, who the Defendant-Appellant believed was handling his matter, defaulted. Also attached as Exhibit D to the Motion (RA 125-135) please find a copy of one of the filed bankruptcies. He and his wife explained to me how he didn't file the bankruptcy, that his signature was forged on the bankruptcy, and his first attorney was suspended from the practice of law (I simply entered his attorney's name in a quick Google search and determined that, pursuant to the Matter of Kalathara 2018 NY Slip Op 08483, decided on December 12, 2018, a Stanley Joseph Kalathara was suspended from the practice of law pending further order of the court for an issue with his escrow account).

Mr. Gomez and his wife explained to me a rather confusing set of facts involving his attempts, with a new attorney, to pay off the mortgage prior to the sale and on the day of the sale. This set of facts is set forth in Exhibit E to the Motion (RA 136-242), previous Proposed Order to Show Cause filed by his second attorney, which contains his affidavit and his attorney's affirmation about what occurred.

In connection with what is set down in that Order to Show Cause, and what I was able to glean via a discussion via telephone with his second attorney and from my conversation with Mr. Gomez and his wife, there were a number of things that surprised me.

First, it appears that Mr. Gomez and his attorney believed they had reached an agreement with the bank to pay off the mortgage (if they brought the funds to the closing).

Second, on the day of the closing, it appears that, although Mr. Gomez was able to secure the funds, and his attorney sent a picture of the certified checks to opposing counsel at 10:17 the morning of the foreclosure sale as he rushed to the Court with the checks, the actual

25

opposing counsel who showed up to defend against the order to show cause to stay the sale informed him that she didn't have authority to accept the funds, would check with her superiors if she might have such authority, told Mr. Gomez' second attorney that she had to check the meter, and then left and never came back, so that the foreclosure went through to the speculators. This I found curious because I could not understand why the Plaintiff would not accept the funds of Mr. Gomez. After the sale went through (which, upon information and belief, was in the amount of $800,000 for a home worth almost twice that) the Plaintiff itself would only receive the same amount as Mr. Gomez was to pay it. Is Mr. Gomez's money less green than the speculator's money? Ultimately, of course, Mr. Gomez would receive the excess of the proceeds, minus, upon information and belief, other costs and fees, but Mr. Gomez would prefer not to lose his home and an additional approximately $700,000 in value of the same to speculators, speculators who, according to Mr. and Ms. Gomez, approached them to tell them, "This is a Jewish neighborhood now. Why do you want to live here?"

Third, on the day of the closing the lower court refused to stop the sale because it did not believe that the picture of the checks were real, or actually would be brought to the lower court. I understand the lower court's concern that these checks might not be actually brought to the lower court to stop the foreclosure, however, if the lower court's concern was that the checks were not real, that is a whole other issue. In fact, in an attempt to prove to the lower court that the checks were real, on Sunday, November 9th, 2019, I went with Mr. Gomez to TD Bank with those checks to get an affidavit as to the checks' authenticity, and the person at the bank refused to do so, looking at me as if to say, "Really, these are Certified Funds from TD Bank, how much more do you need for us to prove that water is wet?"

Among the number of other things that surprised me, there was also a picture which Mr. Gomez' wife showed me of a few men, evidently the speculators who recently acquired the home, standing just outside her home, with workmen's tools, glaring at Ms. Gomez's wife. Quite frankly, that picture seems to involve some menacing. However, I mention that only in passing here, as I intend that picture to be the centerpiece of a subsequent action against the speculators. What I found interesting about that picture is that it looked to me similar to something I have seen in the Wild West movies, with the Bad Guys hired guns threatening the homesteader for his/her land, only in this case there were no guns strapped to the sides of the Bad Guys hired guns involved, just hammers strapped to the sides of the speculator's workers. Please find as Exhibit F to the Motion (RA 243) this picture, so the Court can get an understanding of what I mean.

Subsequently, I reviewed the Complaint and saw that the Plaintiff referred therein to the fact that it had lost the original Note, and that it had attached thereto both a copy of the original Note and a Lost Note Affidavit to demonstrate its standing to foreclose. I reviewed the exhibits to the Summons and Complaint, and was surprised that I had trouble finding the copy of the Note, but did see on page 24 to 30 thereof a Lost Note Affidavit. Please see Exhibit G to the Motion (RA 244-325), the entire Summons and Complaint, as opposing counsel or the Court might have more luck than I did in locating the copy of the original Note.

The reason this surprised me is because, giving my understanding of the Silverberg case and its progeny (discussed further below), one needs an original of the Note to foreclose. In this sense, a copy of a note would be as useless to one's attempt to foreclose as a copy of a dollar bill would be useless to one's attempt to buy a coffee at the local deli. It seems, thus, that an Affidavit of Lost Note (with or without the copy of the original Note) should also be as useless as an Affidavit of Lost Dollar Bill (with or without the copy of the original dollar bill) to buy a cup of coffee at the local deli.

Mr. Gomez's story, together with arguments in favor of the Motion which I have discussed with him in connection with what has happened to him, which he agrees with, and which I incorporated as part of my Affirmation to the Motion in the interest of efficiency in the Court's use of its own limited resources, is set out in the Affidavit of Defendant attached to the Motion as Exhibit A (RA 41-102), which I present below:

'1.      I am the owner of the premises the subject of the above captioned matter, one of the Defendants, and I am familiar with, and have personal knowledge of, all of the facts in this case, including the matters set forth herein, except as to matters asserted upon information and belief.

2. I make this affidavit in in support of the instant Emergency Order to Show Cause.  Since I speak primarily Spanish, I have had this Affidavit read to me and explained to me by my present attorney and I stand by what is written here. I also attach hereto a letter in my own words, in Spanish, explaining other issues regarding the Home which I hope, subsequent to a translation to be provided as part of my attorney's reply to the Plaintiff's papers in opposition to this Motion, the Court will consider as part of the equities of the instant matter.

3. As my attorney attempts to explain in his papers, I speak primarily Spanish and am not entirely sophisticated in real estate (and even less sophisticated in foreclosures). I understand that the law might not give this the consideration that some might consider it should give, but I think the Court should factor these things in when it considers the arguments that the lawyer for the Plaintiff will likely put forward regarding my previous attorney's failure to answer and its filing of two bankruptcies, without my permission and without my signature.

4. For example, the lawyer for the Plaintiff will likely argue that my previous lawyer's failure is, ultimately, my fault according to the law.

5. However, if I am not a lawyer, if I am not sophisticated in foreclosure matters, and I have hired a lawyer, communicating with his office (attached hereto text messages with his secretary), with the belief that I am handling the matter in the proper way… is it really my fault that my previous lawyer simply failed to represent me properly? What happens if this lawyer is simply suspended from the practice of law, as in my case?

6.      I could understand if I was a sophisticated litigant that I should be responsible for my lawyer's errors, as in that sense the lawyer is effectively my employee (given the bargaining power relationship between a sophisticated litigant and his attorney) and there is a bit of a *respondeat superior* dynamic in the relationship (where an employer is

27

responsible for his employee's acts).

7. In Latin America, where I come from and where I spent my youth and developed my view of how the world works, we call all attorneys "Doctor". The word loses a bit of something in the translation, but it gives you some idea of the high regard (almost awe) in which those who live in Latin America, especially those of humble origins like me, hold attorneys.

8.      For us, it is simply unheard of to even question the course of action recommended by a Doctor (attorney).

9.      By analogy, would you, your Honor, even question a course of anti-biotics recommended to you by your Medical Doctor? You would, of course, take that course of anti-biotics.

10.     And what if that course of anti-biotics is the wrong course of anti-biotics, your Medical Doctor is a quack, and you are about to die simply because you trusted that Medical Doctor knew what he was doing?

11. What if, moreover, you finally find a Medical Doctor who speaks your language who has a different course of anti-biotics which he thinks is far more effective, but you are told that it was too late to take that new course of anti-biotics, not because it was too late for it to work but because it was simply too late to reverse the damage caused by you taking that course of anti-biotics because you simply wouldn't be permitted as you assume the fault of your first Medical Doctor that you took that course of anti-biotics (effectively, *respondeat superior* – you hired him, he was your employee, and you have to answer for his errors).

12. Your honor, my family and I live in the home the subject of the instant action, and a number of odd things have occurred in connection with my attempt to stop the sale of my home, and to pay off the debt, as explained in the previous Order to Show Cause by my second attorney attached as an Exhibit. I wanted the opportunity to pay off of debt on a home in the amount of about $150,000, for a home that is worth about $1.5 Million, and the Plaintiff seemed for some reason to be able to finesse its way out of accepting my payment. It seems to me that justice dictates that, before we are made homeless, we are at the very least permitted an opportunity to meaningfully defend ourselves.

12. People interested in acquiring my home have come to my family to tell us that, "This is a Jewish neighborhood now, why do you want to live here?"

13. I will tell you why – I have lived here for over 20 years, and through many of those years I had a drycleaning business in the neighborhood in which I served, and got to know, all of the people in my neighborhood, Jewish, Latino, etc.. These are my neighbors, and they like me, and I like them. My family is now being threatened by these speculators who want to force me out of my home.

14. I know my neighbors, regardless of religion or ethnic background, would not agree

28

with what is occurring to me.

15. I hope the Court will grant me the relief requested in this Motion, as I simply want the opportunity to avail myself of the mechanisms set forth in the law, mechanisms which were put in place by the legislature and the courts for very good reasons, to defend myself in this action, and to force the people who put me in the present circumstances to account for their acts as well.'

The above demonstrates that the Defendant-Appellant has had no meaningful opportunity to defend his home from foreclosure, and a number of odd things have occurred with this particular foreclosure which justify that he should have this opportunity."

81. Ultimately, Mr. Gomez has lost his Home to a group of persons and entities, all of whom appear to have conspired to ensure that they all benefit from Mr. Gomez' loss.

82. Bank of America was able (via the efforts of Bank of America's agent, Caliber, and its attorneys) to collect via the U.S. Bank Trust Foreclosure Sale (pushed forward by U.S. Bank Trust's agent, Caliber, and its attorneys in complete disregard of the right of Mr. Gomez to be provided with a payoff amount and opportunity to pay that amount to stop the foreclosure) on a Note and Mortgage which would not have been so easily collected upon by Bank of America had it pursued its own foreclosure (since it obtained its Order of Reference with the wrong copy of the Note, and simply switched to the right copy of the Note to obtain a Final Judgment of Foreclosure, hiding the fact of the switch from the Hon. Timothy Dufficy).

83. U.S. Bank Trust was able (via the efforts of its agent, Caliber, and its attorneys) to collect on its Note and Mortgage from the foreclosure sale of the Home, which foreclosure was guaranteed, regardless of the fact that Mr. Gomez had the money to pay off the loan. The foreclosure was guaranteed because: a) its agent, Caliber (who was also the agent of Bank of America) and U.S. Bank Trust's attorneys were able to simply dodge all of Mr. Gomez' attorney's various requests for a pay off on the loan; b) when they were

unable to dodge Mr. Gomez's attorney's request for a payoff on the day before the foreclosure sale date, they simply refused to accept payment from Mr. Gomez as they deemed the same to be too late (without regard for the fact that the lateness of the payment was due to the fact that the payoff amount had only been provided to Mr. Gomez' attorney the day before the date of the sale); and c) as the foreclosure sale was imminent, they simply had Bank of America's attorney, Ms. Montaro, request a moment to  renew her parking meter and then just fail to return (evidently, without any concern that she might be sanctioned by the Hon. Denis Butler for making up an excuse to leave his courtroom [to check the parking meter] and then simply fail to return).

84. Caliber was able to ensure both its clients received their payment, and the person within Caliber charged with this property was able to receive his/her kick-back from a speculator (upon information and belief, sophisticated speculators often deal directly with insiders at the servicer or the bank to ensure they get the best deal on a foreclosed home).

85. Joseph Wartelsky and Kehilas Bais Ysroel were able to obtain, for the price of $810,000, a property worth far in excess of the same (estimated to be worth $1,500,000), via a foreclosure sale system in Queens in which various speculators agree not to bid on properties considered to be in a territory reserved for other speculators, thus ensuring via such collusion that they each receive the lowest price for a given property.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Conduct and Participation in a RICO Enterprise**
**through a Pattern of Racketeering Activity:**
**18 U.S.C. §§ 1961(5), 1962(c)**

86. Plaintiff(s) now re-allege each and every allegation as set forth above, and hereby

incorporate the same by reference, as if all were set forth fully herein.

87. At various times and places partially enumerated above, all Defendants did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

88. If any of the Defendants could be termed the ringleader(s) of said RICO enterprise of individuals who were associated-in-fact, it would be Caliber.

89. This association-in-fact RICO enterprise possessed, without limitation, the following three characteristics: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *See Boyle v. United States*, 129 S.Ct. 2237 (2009).

90. Plaintiff(s) allege that in this association-in-fact RICO enterprise its members shared the common purpose to seize control of the Home through the foreclosure of the Home, in which each member carried out its role in the enterprise to extract as much money as possible from the Home, exploiting vulnerabilities within the mortgage foreclosure process, and which enterprise operated over several years in order to complete its purpose.

91. Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise (by being employed by, associated with, operating and/or managing said enterprise) through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

31

92. All Defendants did also during a period at least within the last ten years cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. § 196l(l)(B): 18 U.S.C. § 1341 - Frauds and Swindles [relating to mail fraud]; 18 U.S.C. § 1343 - Fraud by Wire, Radio or Television [relating to wire fraud]; 18 U.S.C. § 1344 - Bank Fraud [relating to financial institution fraud]; 18 U.S.C. § 1503 [relating to obstruction of justice]; 18 U.S.C. § 1956 - Laundering of Monetary Instruments [relating to the laundering of monetary instruments]; 18 U.S.C. § 2314 [Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting]; and 18 U.S.C. § 2315 [Sale or receipt of stolen goods, securities, moneys, or fraudulent State tax stamps]; and did so in violation of the RICO law at 18 U.S.C. l 962(c) (Prohibited activities) as set forth above.

93. Plaintiff(s) further allege that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

94. Plaintiff(s) also allege that they are not the only person that has been victimized by this RICO enterprise but, in fact, this RICO enterprise has victimized other persons and will if permitted to continue to operate victimize other persons throughout New York State and the United States of America.

95. Plaintiff(s) further allege that they suffered injury to their business or property, including, without limitation, the loss to foreclosure of the Home, which Home is worth approximately One Million Five Hundred Thousand United States Dollars in the present market and

such predicate acts of the racketeering activity as mentioned above were the proximate cause of such injury and/or damages.

96. Plaintiffs allege that civil liability attaches to each Defendant on account of the above, and that the enterprise is distinct from each Defendant person.

## AS AND FOR A SECOND CAUSE OF ACTION
### Conspiracy to Engage in a
### Pattern of Racketeering Activity:
### 18 U.S.C. §§ 1961(5), 1962(d)

97. Plaintiff(s) now re-allege each and every allegation as set forth above, and hereby incorporate the same by reference, as if all were set forth fully herein.

98. At various times and places partially enumerated above, all Defendants did also conspire to conduct and participate in said RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9).

99. All Defendants did also during a period at least within the last ten years cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. § 1961(1)(B): 18 U.S.C. § 1341 - Frauds and Swindles [relating to mail fraud]; 18 U.S.C. § 1343 - Fraud by Wire, Radio or Television [relating to wire fraud]; 18 U.S.C. § 1344 - Bank Fraud [relating to financial institution fraud]; 18 U.S.C. § 1503 [relating to obstruction of justice]; 18 U.S.C. § 1956 - Laundering of Monetary Instruments (relating to the laundering of monetary instruments); 18 U.S.C. § 2314 [Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting]; and 18 U.S.C. § 2315 [Sale or receipt of stolen goods, securities, moneys, or fraudulent State tax stamps]; and did so in violation of the RICO law at 18 U.S.C. § l962(d), as enumerated above.

33

100.    Plaintiff(s) further alleges that all Defendants did commit two (2) or more of the

offenses itemized above in a manner which they calculated and premeditated

intentionally to threaten continuity, i.e. a continuing threat of their respective

racketeering activities, also in violation of 18 U.S.C. § l962(d).

101.    Plaintiff(s) also allege that they are not the only person that has been victimized

by this RICO enterprise but, in fact, this RICO enterprise has victimized other persons

and will if permitted to continue to operate will victimize other persons throughout New

York State and the United States of America.

102.    Plaintiff(s) further allege that they suffered injury to their business or property,

including, without limitation, the loss to foreclosure of the Home, which Home is worth

approximately One Million Five Hundred Thousand United States Dollars in the present

market, and such predicate acts of the racketeering activity as mentioned above were the

proximate cause of such injury and/or damages.

103.    Plaintiff(s) allege that civil liability attaches to each Defendant on account of the

above, and that the enterprise is distinct from each Defendant person.

## AS AND FOR A THIRD CAUSE OF ACTION
## FRAUD

104.    Mr. Gomez reasserts and realleges the above paragraphs as though fully set

forth herein.

105.    Upon information and belief, the Defendant(s) fraudulently and knowingly made

a number of misrepresentations and failures to disclose, as set forth in greater detail

above, in order to defeat Mr. Gomez's attempts to pay off the First Mortgage, and to

force through the U.S. Bank Trust foreclosure so that Bank of America could receive its

34

payment on the Second Mortgage in spite of the misrepresentations and failures to disclose of Bank of America and its attorneys made as part of the Bank of America foreclosure.

106.    Mr. Gomez has, to his detriment, relied upon the knowingly false representations and failures to disclose of the Defendant(s), as set forth in greater detail above.

107.    Mr. Gomez suffered serious injury as the proximate result of his reliance on misrepresentations and failures to disclose by Defendant(s). The actions of Defendant(s) were willful and knowing.

108.    As a result of this fraud, Defendant(s) are liable to Mr. Gomez for actual damages in an amount to be determined at trial, treble damages, punitive damages, costs and disbursements.

<u>**AS AND FOR A FOURTH CAUSE OF ACTION**</u>
<u>**CONSPIRACY TO COMMIT FRAUD**</u>

109.    Mr. Gomez reasserts and realleges the above paragraphs as though fully set forth herein.

110.    At various times and places discussed above, Defendant(s) did also intentionally conspire to defraud Mr. Gomez, through a corrupt agreement between two or more persons, as more specifically described above, and committed a number of overt acts, as more specifically described above, in furtherance of that agreement, with those persons' intentional participation in the furtherance of a plan or purpose to unlawfully secure benefits from the foreclosure sale of the Home.

111.    Upon information and belief, the above-referenced acts taken as a whole evidence that Defendant(s) and/or its agents have conspired in the above-referenced manner to injure Mr. Gomez and Defendant(s), and are thus liable for all the acts of

35

these persons and entities.

112.     As a result of this conspiracy to commit fraud, Defendant(s) are liable to Mr.

Gomez for actual damages in an amount to be determined at trial, punitive damages,

costs and disbursements.

### AS AND FOR A FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT

113.     Mr. Gomez reasserts and realleges the above paragraphs as though fully set forth

herein.

114.     Defendants have been enriched to the detriment of Mr. Gomez via the acts set

forth in further detail above.

115.     It is against equity and good conscience to permit Defendants to retain the

monetary gains the result of their acts.

116.     By virtue of the foregoing, the Defendants have been unjustly enriched to the

detriment of Mr. Gomez in the sum of at least $1.5 Million.

### AS AND FOR A SIXTH CAUSE OF ACTION IN THE
### ALTERNATIVE FOR RECISSION OF FORECLOSURE
### SALE

117.     Mr. Gomez reasserts and realleges the above paragraphs as though fully set forth

herein.

118.     Upon information and belief, the Defendants conspired with and among each

other to improperly and illicitly cause the transfer of title of the Home from Mr. Gomez

to Defendants Joseph Wartelsky and Kehilas Bais Ysroel.

119.     By virtue of the foregoing, Mr. Gomez is entitled to judgment rescinding the

Foreclosure sale and transferring title back to Mr. Gomez from Defendants Joseph

Wartelsky and/or Kehilas Bais Ysroel.

120.    Mr. Gomez has no adequate remedy at law.

<b>AS AND FOR A SEVENTH CAUSE OF ACTION<br>DECLARATION THAT TITLE TO THE HOME<br>REMAINS IN MR. GOMEZ</b>

121.    Mr. Gomez reasserts and realleges the above paragraphs as though fully set forth

herein.

122.    Mr. Gomez has a justifiable controversy with Defendants Joseph Wartelsky

and/or Kehilas Bais Ysroel as to which part is the rightful owner of the Home.

123.    The harm caused to Mr. Gomez by Defendants is direct and immediate.

124.    By virtue of the foregoing, Mr. Gomez is entitled to judgment declaring that title

to the Home remains in the name of Mr. Gomez.

<b>AS AND FOR AN EIGHTH CAUSE OF ACTION<br>FOR A PRELIMINARY INJUNCTION BARRING ANY<br>SALE OF THE HOME BY DEFENDANTS JOSEPH<br>WARTELSKY AND/OR KEHILAS BAIS YSROEL</b>

125.    Mr. Gomez reasserts and realleges the above paragraphs as though fully set forth

herein.

126.    There is a likelihood of success on the causes of action stated by Mr. Gomez

herein.

127.    Mr. Gomez will suffer irreparable injury if injunctive relief is not granted to him

by this Court and the Home is transferred to a "Bona fide purchaser" by Defendants.

128.    The balance of equities are in the favor of Mr. Gomez.

129.    By virtue of the foregoing, Mr. Gomez is entitled to a preliminary injunction

barring any sale of the Home pending the hearing and determination of this matter.

<b>AS AND FOR A NINTH CAUSE OF ACTION<br>FOR A PRELIMINARY INJUNCTION BARRING MR.</b>

### GOMEZ' EVICTION FROM THE HOME BY DEFENDANTS JOSEPH WARTELSKY AND/OR KEHILAS BAIS YSROEL

130.     Mr. Gomez reasserts and realleges the above paragraphs as though fully set forth herein.

131.     Defendants Joseph Wartelsky and/or Kehilas Bais Ysroel have secured a warrant of eviction against Mr. Gomez, stayed only due to COVID restrictions (attached hereto as Exhibit 39 case summary on Queens Civil Court LT-073238-19/QU).

132.     There is a likelihood of success on the causes of action stated by Mr. Gomez herein.

133.     Mr. Gomez will suffer irreparable injury if injunctive relief is not granted to him by this Court.

134.     The balance of equities are in the favor of Mr. Gomez.

135.     By virtue of the foregoing, Mr. Gomez is entitled to a preliminary injunction barring his eviction from the Home pending the hearing and determination of this matter.

### PLAINTIFF(S) DEMAND A TRIAL BY JURY

136.     Plaintiff(s) hereby demand a trial by jury in this action.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff(s) pray for judgment against Defendant(s) and asks this Court to:

137.   On the First Cause of Action, award the Plaintiff(s) damages in an amount to be determined at trial, but believed to be in excess of $1,500,000, plus treble damages and punitive damages where warranted.

138.   On the Second Cause of Action, award the Plaintiff(s) damages in an amount to be determined at trial, but believed to be in excess of $1,500,000, plus treble damages and punitive damages where warranted.

139.   On the Third Cause of Action, award the Plaintiff(s) damages in an amount to be determined at trial, but believed to be in excess of $1,500,000, plus treble damages and punitive damages where warranted.

140.   On the Fourth Cause of Action, award the Plaintiff(s) damages in an amount to be determined at trial, but believed to be in excess of $1,500,000, plus treble damages and punitive damages where warranted.

141.   On the Fifth Cause of Action, award the Plaintiff(s) damages in an amount to be determined at trial, but believed to be in excess of $1,500,000, plus treble damages and punitive damages where warranted.

142.   On the Sixth Cause of Action, award the Plaintiff(s) judgment rescinding the Foreclosure sale and transferring title back to Mr. Gomez from Defendants Joseph Wartelsky and/or Kehilas Bais Ysroel.

143.   On the Seventh Cause of Action, award the Plaintiff(s) judgment declaring that title to the Home remains in the name of Mr. Gomez

144.   On the Eighth Cause of Action, issuance of a preliminary injunction barring the

sale of the Home pending the hearing and determination of this matter.

145.     On the Ninth Cause of Action, issuance of a preliminary injunction barring Mr.

Gomez' eviction from the Home pending the hearing and determination of this matter.

146.     Award the Plaintiff(s) attorney's fees, disbursements, costs, and interest; and

147.     Grant the Plaintiff(s) such other and further relief as the Court may deem just and
proper.


Howard Beach, New York
February 12, 2021


                                        /s/Jay Sanchez
                                        _____

                                        Jay Sanchez
                                        The Law Office of J.A. Sanchez-Dorta
                                        95-27 156th Avenue
                                        Howard Beach, New York 11414
                                        Tel:(646)657-5345
                                        Email:
                                        janthonysanchez@post.harvard.edu
                                        Attorney Bar Code JS3070
                                        Counsel for Plaintiff(s)

## VERIFICATION

STATE OF NEW YORK

COUNTY OF QUEENS

FELIX GOMEZ, being duly sworn, deposes and says:

I am the Plaintiff in the within action.

I have read (or have had read to me) the foregoing Complaint and know the contents thereof.

That the same is true to my knowledge, except as to those matters therein stated to be

alleged upon information and belief, and as to those matters I believe them to be true.

FELIX GOMEZ

Sworn to before me this 2/th day of February, 2021

NOTARY PUBLIC

POLLY AJODHA
STATE
OF NEW YORK
NOTARY PUBLIC
Qualified in
Queens County
01AJ6281689
MY COMMISSION EXPIRES 05

41